

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | |
| **MARK D. SMITH** § | | |
| xxx-xx-2258 § | Case No. 04-90150 | |
| 262 Stone's Throw Ave., Livingston, TX 77351 § | | |
| § | | |
| Debtor § | Chapter 7 | |
| | | |
| DANIEL J. GOLDBERG, § | | |
| Chapter 7 Trustee § | | |
| § | | |
| Plaintiff § | | |
| § | | |
| v. § | Adversary No. 07-9002 | |
| § | | |
| ROBERT CLAY VILT § | | |
| § | | |
| Defendant § | | |

## MEMORANDUM OF DECISION

This matter is before the Court upon trial of the Complaint for Disgorgement of An Unauthorized Fee and for Negligence filed by the Plaintiff, Daniel J. Goldberg (the "Trustee"), in his capacity as the Chapter 7 Trustee in the above-referenced bankruptcy case. The complaint seeks the disgorgement of a $103,200.00 "referral" or "forwarding" fee received in the post-petition period by the Defendant, and Debtor's attorney, Robert Clay Vilt.[1] Upon conclusion of the trial of the complaint and the submission of post-trial briefing by the parties, the Court took the matter under advisement. This memorandum of

---

[1] The Court will utilize the term "referral fee" in this opinion since that is the term utilized by the parties. However, §1.04(f) of the Texas Disciplinary Rules of Professional Conduct, as it existed in 2003, referred to the attorney in Vilt's position as the "forwarding lawyer."

decision disposes of all issues pending before the Court.[2]

## Background

Prior to the filing of his bankruptcy petition, Mark D. Smith (the "Debtor") was the plaintiff in a lawsuit that was pending in the 411th District Court of Polk County, Texas, under Case No. CIV20889, that was styled *Mark D. Smith, Individually and as Representative of Estate of Amanda Smith; James Trull, Individually a/n/f of Ashley Trull; and Charlie Williams, Individually and a/n/f of Cassey Nielson v. Garvey and Karen Jackson, CH Marine Ace Lab, Inc. Aka Ace Hoist Company and Jared Hunter, Individually and d/b/a Hunter Electric* (the "Lawsuit").[3] Smith and the other plaintiffs were represented in the Lawsuit by Loren G. Klitsas ("Klitsas") of the law firm of Klitsas & Vercher, P.C. in Houston pursuant to a contingent fee contract executed on July 8, 2003.[4] Smith had been referred to Klitsas by another Houston attorney, the Defendant, Robert Clay Vilt (hereinafter the "Defendant" or "Vilt"). Vilt, who had been a "good friend" to Smith for nearly ten years, is an attorney who views himself as a construction law specialist but who, by his own count, had represented 20 to 30 debtors in bankruptcy cases since 2003.

---

[2] This Court has jurisdiction to consider the Complaint pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157(a). The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (B) (E), and (O).

[3] The Lawsuit alleged that on or about June 21, 2003, while on the property of Mr. and Mrs. Jackson, the Debtor's minor daughter, Amanda Smith, was killed by electrocution caused by an improperly installed jet ski lift and that the Defendants' negligence caused her death.

[4] *See* Ex. T-10 at pp. 6-7.

During the pendency of the Lawsuit, Smith experienced financial difficulties and he consulted with Vilt regarding those problems. The result of those consultations was the filing of a voluntary petition for relief under Chapter 7 by Smith on February 24, 2004. Vilt filed the Chapter 7 petition on behalf of his friend and agreed to accept no fee for such representation.[5] Daniel J. Goldberg (the "Trustee") was appointed as the Chapter 7 Trustee in the case.

The Debtor filed his original schedules and statements with the petition and the existence of the Lawsuit was not disclosed either in the Debtor's Schedule B or in his original statement of financial affairs. Neither was the Lawsuit mentioned in his claims of exempt property listed in Schedule C. Though not technically valid, the Lawsuit was first revealed in an unsworn supplement to the statement of financial affairs that was filed by the Debtor on March 15, 2004.[6]

At the first meeting of creditors held on March 19, 2004, the Trustee first learned of the Lawsuit and of Klitsas' role as the Debtor's state court attorney in that suit. Though Vilt was representing the Debtor at that meeting, neither he nor the Debtor said

---

[5] *See* Ex. T-3 which is Vilt's "Rule 2016(b) – Statement of Attorney Compensation" as required by Fed. R. Bankr. P. 2016(b) in which Vilt represented that "compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor in contemplation or in connection with the bankruptcy case is as follows . . .
    For legal services, I have agreed to accept    $ none
    Prior to the filing of this statement, I have received    $ none
    Balance Due    $ none

[6] *See* Ex. T-6.

anything about Vilt's entitlement to any funds arising from the Lawsuit. The Trustee further informed the Debtor and Vilt at that meeting that the Lawsuit constituted property of the bankruptcy estate, that it could not be properly settled without notice to creditors and the approval of the Bankruptcy Court, and that any money ultimately received from the trial or settlement of the Lawsuit must be paid to him as the representative of the bankruptcy estate. Both the Debtor and Vilt signed an acknowledgment of that obligation.[7]

The Trustee informed Klitsas of those same obligations via a letter transmitted by both fax and electronic means on May 7, 2004.[8] A copy of that letter was also sent to Vilt. Vilt communicated with the Trustee on other issues after the initial creditors' meeting and yet nothing was disclosed about the referral fee.[9] The Trustee then proceeded to hire Klitsas, and <u>only</u> Klitsas, as special counsel to the bankruptcy estate for the purpose of prosecuting the Lawsuit, with compensation to be based upon the

---

[7] *See* Ex. T-4: *Sworn Testimony As to Property Interests Subject to Administration Under Chapter 7*, which was signed by the Debtor and Vilt on April 19, 2004 and states:

> You have sworn a legal obligation, as provided by law, to promptly provide me with the information requested herein upon learning that any of the above information applied. I request that you advise me in writing of all of the facts which are necessary to fully determine whether the circumstances of your case required action by me as your Trustee. If you receive money or property under any of the categories listed above, you **must** keep all such monies or property in your possession until I have directed you to take a specific course of action.

This duty was subsequently affirmed by Smith and Vilt at the second §341 meeting of creditors. *See* Ex. T-13.

[8] *See* Ex. T-4.

[9] *See, e.g.,* Ex. T-12.

contingent fee contract previously agreed upon between Klitsas and the Debtor. That employment application was subsequently granted by this Court.[10]

As the prosecution of the Lawsuit continued, the Debtor filed an amended Schedule B on June 2, 2004, which additionally identified the Lawsuit as a contingent and unliquidated claim constituting property of the bankruptcy estate.[11] No amendment of Schedule C was ever presented. Thus, at all times relevant hereto, the Debtor never claimed any portion of the Lawsuit as exempt property.

Unbeknownst to the Trustee, Klitsas and Vilt settled the Debtor's claims in the Lawsuit through mediation in March 2005 for the sum of $630,000.00.[12] According to the Settlement Disbursement Statement,[13] the $630,000.00 was disbursed in the following amounts:

| | |
|---|---|
| To Klitsas & Vercher, P.C. | |
|     Attorneys fees | $252,000.00 |
|     Expenses | $33,239.82 |
| To Blue Cross Blue Shield (Lien) | $8,869.39 |
| To Mark D. Smith | $335,890.79[14] |

---

[10] See *Order Approving the Employment of Loren G. Klitsas as Special Counsel for the Estate* entered on June 14, 2004 (dkt #21).

[11] *See* Ex. T-9.

[12] All of the claims asserted in the Lawsuit were settled for $1.4 million, $630,000 of which was attributed to the Debtor's claim. Of course, the Debtor had no authority to settle the claim at mediation since it was owned by the bankruptcy estate. Though Klitsas had authority to act for the bankruptcy estate, his actions were taken without the knowledge or approval of his client, the Trustee. Subsequently, the Trustee did approve of the settlement terms and correspondingly sought court approval of that settlement under Rule 9019.

[13] *See* Ex. D-1, p.2 and Ex. T-15.

[14] *See* Ex. T-50. Actually, the Debtor first tendered the endorsed check to Vilt, but Vilt claims that his bank would not accept it as a deposit to his account, so Vilt simply gave the endorsed check back

From his 40% share, Klitsas paid Vilt a referral fee of $123,200.00,[15] leaving Klitsas with the sum of $128,800.00 derived from the settlement of the Debtor's claim.

The Trustee was not informed of any of these developments, even though between the hiring of Klitsas in June 2004 and October 2006, the Trustee had made repeated inquiries to Klitsas and to Vilt regarding the status of the Lawsuit.[16] For a considerable period after the settlement had been consummated and moneys distributed, no disclosure of the settlement was given to the Trustee. Finally, on October 26, 2006, apparently in response to his latest inquiry, the Trustee received a voice mail from Klitsas informing him of the settlement. The Trustee immediately contacted Klitsas and Vilt, only then learning from Klitsas the details of the payment of the $630,000.00 which had occurred 19 months earlier. The Trustee made an immediate demand on the attorneys for a full and complete accounting of the settlement proceeds and for copies of all related documentation.[17]

Even after the failure to involve the Trustee in the settlement and the significant delay in notifying him of the settlement, neither Vilt nor Klitsas disclosed to the Trustee or to the Court that Vilt had been paid a fee in excess of $100,000 from the settlement proceeds. Klitsas immediately demanded information from Vilt regarding his

---

to the Debtor who ultimately deposited it in a friend's bank account.

[15] *See* Ex. T-18.

[16] *See* Ex. T-19 through T-24.

[17] *See* Ex. T-26.

interactions, or lack thereof, with the Trustee.[18] Vilt responded to this crisis, not with the requested accounting, but rather with an ill-advised and ill-informed challenge to the Trustee's authority by sending the Trustee the following faxed message:

> Dan:
>   In response to your letter dated October 27, 2006, we obtained our file from the storage facility and reviewed its contents. During that process, we determined that this case was closed in 2004 because Mr. Smith was discharged from the debts listed in his bankruptcy scheduled [sic] by Judge Parker in 2004. Enclosed herewith is a copy of the related Discharge of Debtor dated 08/24/04. Accordingly, it does not make sense that you are still the Chapter 7 Trustee of this case since the [sic] Mr. Smith has already been discharged.
>   Thank you for your prompt attention to this matter![19]

The Trustee quickly corrected Vilt's ignorance or intransigence about bankruptcy case administration and the validity of his authority, and the Trustee again demanded turnover of all of the settlement funds.[20]

It seems apparent that Klitsas and his law partner, Mr. Vercher, subsequently confirmed through independent bankruptcy counsel both the accuracy of the Trustee's

---

[18] There is some indication that it may, in fact, have been an inadvertent failure by Klitsas. *See* Ex. T-23 and T-27 which indicates the Klitsas firm was relying upon Vilt to handle all of the bankruptcy aspects of the representation, including the ramifications of the mediated settlement. Ex. T-14 indicates that Vilt was inducing such reliance by falsely claiming a desire to coordinate the settlement of the Lawsuit with the Trustee. Klitsas and his partner, Ron Vercher, apparently believed that they had been "blindsided" by Vilt's failure to handle his duties. Of course, that does not excuse Klitsas from his failure to fulfill his independent duty to the Trustee and the bankruptcy estate since he was actually the attorney hired as the special counsel for the Estate.

[19] *See* Ex. T-28.

[20] *See* Ex. T-29 and T-31.

assertions regarding the serious impropriety of what had occurred and the possible ramifications if restitution was not provided to the Trustee with the utmost urgency.[21] They acted accordingly. Klitsas and Vercher sought to reverse the Debtor's efforts to conceal his wrongful appropriation of the settlement proceeds. In order to erase the shortfall of money which the Debtor improperly appropriated and could not immediately reimburse, they tendered the remainder of their earned fees back to the Trustee. Their interactions with Vilt to obtain his cooperation and contribution became contentious.[22]

After various maneuvers to obtain the required funds, the bankruptcy estate was made whole. Restitution of the $335,890.79 constituting the estate's share of the settlement proceeds was made from the following sources:

> $186,068.86 from the Debtor, Mark D. Smith,
> $20,000.00 from Vilt; and
> the remaining $129,821.93 from Klitsas & Vercher, P.C.

After receiving restitution of the estate's share of the proceeds, the Trustee proceeded to take a number of actions. He sought and received *nunc pro tunc* approval of the settlement and the compensation to be paid to Klitsas & Vercher, P.C., with the express proviso, however, that "such approval is not to be construed as an approval of the amounts tendered by Klitsas to Robert C. Vilt nor shall it preclude any appropriate action

---

[21] *See* Ex. T-39.

[22] *See* Ex. T-40.

against Vilt as may be determined by the Court."[23] He subsequently initiated and obtained a revocation of the Chapter 7 discharge which had been previously granted to the Debtor, Mark D. Smith, based upon the Debtor's admitted misappropriation of bankruptcy estate property.[24] Finally, he brought this action against Vilt, seeking disgorgement of the additional $103,200.00 paid to Vilt on various grounds: (1) that the fee was an illegal sharing of compensation contrary to 11 U.S.C. §504; (2) that the fee is barred by §327(e); (3) that the fee was not disclosed to the Court as required by §329(a) and Fed. R. Bankr. P. 2016(b); (4) that the fee was not authorized by the Bankruptcy Court upon proper application as required by §330, Fed. R. Bankr. P. 2016(a), and LBR 2016; and (5) that the amount of the referral fee is excessive under §329(b).

Vilt admits that the sum he received from Klitsas was a referral fee relating to the Lawsuit. There is also no dispute that the referral fee was not disclosed to the Court or to the Trustee. Vilt retreated from his initial defense that he was not required to disclose the referral fee. He now contends, among other defenses, that §504 of the Bankruptcy Code is inapplicable and cannot be used to deprive him of a referral fee that he contends is enforceable under Texas Disciplinary Rule 1.04(f) that was applicable at the time the agreement was executed.

---

[23] See *Order Approving Motion to Settle and Compromise Controversy with Jerald Hunter d/b/a Hunter Electric and Garvey Jackson, Nunc Pro Tunc, and Compensate Lauren Klitsas of the Law Firm of Klitsas and Vercher, P.C. Nunc Pro Tunc* entered on April 3, 2007 (dkt #43).

[24] The revocation was entered by a default judgment entered on January 7, 2008 in adversary proceeding 07-9005 (dkt #5).

**Discussion**

Section 504 of the Bankruptcy Code imposes a prohibition against fee-splitting or the sharing of compensation in virtually all circumstances arising in a bankruptcy case.[25] Section 504(a) of the Bankruptcy Code provides:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share--
>
> (1) any such compensation or reimbursement with another person; or
>
> (2) any compensation or reimbursement received by another person under such sections.

11 U.S.C. §504(a).

This prohibition against sharing compensation is relaxed only among: (1) partners or associates in the same professional association, partnership, or corporation; (2) attorneys for petitioning creditors that join in a petition commencing an involuntary case; and (3) an attorney and a bona fide public service attorney referral program.[26]

This rather unusual proscription, which does not exist in many other areas of attorney activity, is designed to deter any expansion of the size of administrative expense claims which are granted priority under the Bankruptcy Code distribution scheme. As

---

[25] Section 504 significantly departs from the way the Bankruptcy Act dealt with the sharing of compensation. Under the Act, the sharing of compensation "was not denounced except in a case where one of the professionals simply referred or forwarded the bankruptcy case to another professional who thereafter rendered all of the services." *In re Matis*, 73 B.R. 228, 230-31 (Bankr. N.D.N.Y. 1987).

[26] *See* 11 U.S.C. §504(b) and (c).

one leading treatise explains,

> Whenever fees or other compensation are shared among two or more professionals, there is incentive to adjust upward the compensation sought in order to offset any diminution to one's share. Consequently, sharing of compensation can inflate the cost of a bankruptcy case to the debtor, and therefore to the creditors. Fee splitting also subjects the professional to outside influences over which the court has no control, which tends to transfer from the court some degree of power over expenditure and allowances. . . . The potential for harm makes such arrangements reprehensible as a matter of public policy as well as a violation of the attorney's ethical obligations.

4 COLLIER ON BANKRUPTCY ¶ 504.01 at p.504-3 (15th ed. rev. 2005) (citing *Well v. Neary*, 278 U.S. 160, 173-74 (1929)). "It is thus a 'potential for harm' that supports an absolute prohibition." *In re Peterson*, 2004 WL 1895201 at *4 (Bankr. D. Idaho Aug. 25, 2004). Section 504 "was promulgated to prevent certain forms of fee sharing agreements that undermine the integrity of the bankruptcy proceeding, *most commonly involving the sharing of compensation between two parties when one party is given a referral fee*, or when one party appointed by the court hired another party to work on the case without court approval." *In re Winstar Comms., Inc.*, 378 B.R. 756, 760 (Bankr. D. Del. 2007) (citing *In re Hepner*, 2007 WL 161003 at *2 (Bankr. S.D. Tex. 2007) (emphasis added). Therefore, attorneys of different firms who represent the same entity are generally required to seek and obtain court approval of their retention and fees independently of each other. Only three elements need be proven in order to constitute a violation of

§504:

    (1) a person or entity was awarded compensation under §503(b)(2) or §503(b)(4);

    (2) a person or entity shared or agreed to share in the awarded compensation; and

    (3) the person or entity that shared the compensation does not fit within one of the statutory exceptions.

Those three elements are clearly established in this case. It is undisputed that Klitsas & Vercher, P.C. was awarded its expenses and fees pursuant to §§503(b)(2) and 330(a).[27] Vilt admitted that he received a referral fee of $123,200.00 from Klitsas who paid the money to Vilt from the settlement proceeds belonging to the bankruptcy estate without the knowledge of the Trustee. Such sums were paid out of the compensation that Klitsas expected to receive from the estate (and was ultimately awarded) under §§503(2) and 330(a). It is further undisputed that Vilt is neither a partner nor an associate of Klitsas & Vercher, P.C. Finally, this case was not initiated by an involuntary bankruptcy petition nor did it involve an attorney referral program.

Yet Vilt contends that the referral fee agreement does not violate §504 because the agreement was reached before the Debtor filed for bankruptcy. That defense is ineffective on two grounds. First of all, Klitsas (and Vilt taking through him) was never compensated with the Debtor's funds on the basis of the pre-petition contingent fee

---

[27] See *Order Approving Motion to Settle and Compromise Controversy with Jerald Hunter d/b/a Hunter Electric, and Garvey Jackson, Nunc Pro Tunc; and Compensate Loren Klitsas of the Law Firm of Klitsas & Vercher, P.C., Nunc Pro Tunc* entered on April 3, 2007 (dkt #42).

-12-

agreement. Klitsas was compensated with the assets of the bankruptcy estate on the basis of a post-petition employment agreement that simply mirrored the terms of the pre-petition contingent fee agreement. Setting aside that "technicality," the reach of §504 is comprehensive. It is not limited to the post-petition sharing of compensation.[28] *See In re Matis*, 73 B.R. 228 (Bankr. N.D.N.Y. 1987) (finding that the prohibition of §504 against sharing attorney's fees applies to a pre-petition fee-splitting arrangement between two attorneys for representation of the debtor). However, because Vilt ultimately shared in compensation awarded in the post-petition period under §§503(2) and 330(a), the sharing of that compensation undoubtedly violated §504

Vilt also contends that §504 is inapplicable because the attorney's fees were awarded to only Klitsas & Vercher, and not to him. That is a misinterpretation of §504. Section 504 plainly states that no person receiving compensation in a bankruptcy case may share or agree to share such compensation and that *no person can share or agree to share* compensation awarded in a bankruptcy case. (Emphasis added). *See, e.g.*, *Anderson v. Anderson (In re Anderson)*, 936 F.2d 199 (5th Cir. 1991) [finding that, even if an attorney had received an undisclosed $10,000 retainer from the personal funds of his co-counsel father, and not from the funds of the bankruptcy estate (a proposition that the

---

[28] Section 504 extends its prohibition against the sharing of any attorney's fees that may be examined by the court pursuant to § 329. *In re Matis*, 73 B.R. 228, 231-32 (Bankr. N.D.N.Y. 1987). In this case the referral fee agreement was made within the one-year period before the Debtor filed his petition for bankruptcy relief on February 24, 2004. The referral fee agreement, therefore, is swept into the auspices of § 329.

trial court rejected), such payment would have violated 11 U.S.C. §504 "which flatly prohibits the splitting of fees without prior court approval."]. There was certainly no disclosure nor court approval granted to authorize the fee-splitting arrangement in this case. Therefore, the argument that Vilt never "received" the awarded compensation is unavailing, because Congress enacted §504 "to generally prohibit the sharing of compensation or fee splitting among attorneys in [the] bankruptcy context." *In re Matis*, 73 B.R. at 231.

Finally, Vilt argues that the amount to be disgorged should be $80,800.00 rather than $103,200.00. Though he received $123,200.00 as a forwarding fee from Klitsas, Vilt claims that only $100,800.00 of that fee pertained to the referral of the Debtor, and that the remaining $14,400.00 was paid to him as a fee for referring the other plaintiffs in the Lawsuit. Though the Trustee expressed agreement with that contention at trial, the Court cannot accept such a stipulation. The evidence clearly demonstrates that the settlement was composed of $630,000 attributable to the interest of the bankruptcy estate of the Debtor, with another $70,000 paid to James Trull and another $70,000 paid to Kristy Williams, all of whom were represented by Klitsas & Vercher.[29] Because no funds were realized pursuant to the pre-petition employment agreement, and because there was no post-petition agreement with the Trustee to authorize the payment of referral fees for

---

[29] *See* Ex. T-47 and T-48. Another $630,000 payment was made to Phyllis Pippen, a co-representative of the decedent's estate of the Debtor's daughter, who was represented by another attorney.

other plaintiffs out of bankruptcy estate assets (which would have never been approved in any event), no reduction in the amount of the disgorgement can be authorized. That conclusion is supplemented by the general recognition that, to the extent that Vilt was otherwise entitled to a forwarding fee for referring Trull and Williams to Klitsas, such fee should rightfully be paid from the contingent fee attributable to the interests of Trull and Williams – not from the funds of the bankruptcy estate.

Finally, a professional cannot escape the reach of §504 by relying upon the fact that such a fee-sharing arrangement with attorneys outside of his firm may be acceptable in other circumstances in other jurisdictions. The fact that §1.04(f) of the Texas Disciplinary Rules of Professional Conduct at the time permitted the payment of such a fee does not provide a safe harbor for Vilt.[30] The particular policy considerations that led Congress to prohibit the allowance of virtually all referral fees in bankruptcy cases in its

---

[30] At the time, Rule 1.04(f) provided that :

(f) A division or agreement for division of a fee between lawyers who are not in the same firm shall not be made unless:(1) the division is: (i) in proportion to the professional services performed by each lawyer; (ii) made with a forwarding lawyer; or (iii) made, by written agreement with the client, with a lawyer who assumes joint responsibility for the representation; (2) the client is advised of, and does not object to, the participation of all the lawyers involved; and (3) the aggregate fee does not violate paragraph (a).

TEX. DISCIPLINARY R. PROF'L CONDUCT §1.04(f), SUPREME COURT OF TEXAS, STATE BAR RULES, art. X, §9 (Texas Disciplinary Rules of Professional Conduct), reported in 3A TEX. GOVT. CODE ANN. (Vernon 2005). It is interesting to note that the March 5, 2005 amendment to Rule 1.04 eliminated the pure forwarding fee. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(f), 3A TEX. GOVT. CODE ANN. (Vernon Supp. 2008). Since that date, no longer may Texas lawyers collect a referral fee unless they are actually going to work on a case and the new rules require a reasonable correlation between the amount and value of services performed and the share of the fee received.

adoption of §504(a) supersede any state law authority to the contrary.

There is simply "no doubt that section 504(a) is intended to be mandatory and preemptory." 4 COLLIER ON BANKRUPTCY ¶ 504.02[1] at p.504-4. Because §504(a) acts as an absolute prohibition, there is no necessity for the Court to engage in an extensive analysis to determine whether the fee-splitting in this case actually increased the costs to the debtor's estate or whether any actual harm to the bankruptcy estate actually occurred. It does not matter. "Violation of §504(a) is dependent only upon a finding that the prohibited conduct occurred. It does not also require a finding that such conduct actually defeated or compromised the policies underpinning the prohibition." *Peterson*, 2004 WL 1895201 at *4.

Because all of the requisite elements necessary to constitute a violation of the fee-splitting prohibition imposed by §504(a) have been demonstrated by the Trustee,[31] the Court concludes that the relief sought by the adversary complaint should be granted and

---

[31] Since all sums held by Vilt are subject to disgorgement due to his violation of §504(a), the Court need not address the other theories raised by the Plaintiff, though it seems clear that, if construed as a disclosure and/or compensation issue, the Defendant's failure to disclose this post-petition payment of professional compensation through a Rule 2016(b) statement would expose him to total disgorgement as well. *See, e.g., In re Mayeaux*, 269 B.R. 614 (Bankr. E.D. Tex. 2001); 4 COLLIER ON BANKRUPTCY ¶ 504.02[7] at p.504-12 (15th ed. rev. 2005). These were unauthorized payments derived from bankruptcy estate assets at the time they were paid. If services were not rendered by the Defendant, then any fee he received should be disgorged. If professional services were rendered on behalf of the Debtor's estate, disgorgement is still appropriate since he never sought employment under the applicable standards of §§ 327(a) or 328 and he was paid compensation from the assets of the bankruptcy estate without applying for approval of any compensation under the provisions of § 330. "It is well established law that, absent compliance with the Bankruptcy Code and Rules, an attorney has no absolute right to an award of compensation." *Anderson*, 936 F.2d at 204, citing *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989). That is especially true when one fails to seek prior approval of employment. *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1254 (5th Cir. 1986).

the Plaintiff, Daniel Jacob Goldberg, in his capacity as the Trustee of the Chapter 7 Bankruptcy Estate of Mark D. Smith, shall recover from the Defendant, Robert C. Vilt, the sum of $103,200.00, together with pre-judgment interest[32] on such sum since the date of its appropriation, April 6, 2005,[33] to the date of judgment at the rate of 3% per annum, for the total judgment amount of $114,168.84, with post-judgment interest upon such sum at the current post-judgment interest rate of 1.24%.[34]

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[35] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052. An appropriate judgment shall be entered which is consistent with this opinion.

Signed on 10/20/2008

_____
THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[32] Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute. *Matter of Texas General Petroleum Corp.* 52 F.3d 1330, 1339-40 (5th Cir. 1995). The federal rate of post-judgment interest was 3.38% on April 6, 2005. The lowered rate of 3% utilized here is designed to reflect the fact that interest rates slowly increased and then slowly declined during the pre-judgment period.

[33] *See* Ex. T-18.

[34] "Generally, a finding of improper sharing of compensation results in a denial or disgorgement of compensation." 4 COLLIER ON BANKRUPTCY ¶ 504.02[6] at p.504-11 & 504-12 (15th ed. rev. 2005), cited in In re Greer, 271 B.R. 426, 433 (Bankr. D. Mass. 2002). To the extent that this Court possesses any discretion to determine whether anything less than total disgorgement would be appropriate, it declines to exercise that discretion under these circumstances.

[35] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.